# Exhibit 1

## DECLARATION OF LOGAN WILKE
### PURSUANT TO 28 U.S.C. § 1746

I, Logan Wilke, hereby declare as follows:

1.      My name is Logan Wilke. I am a United States citizen and I am over twenty-one years of age. I am an attorney employed by the U.S. Federal Trade Commission ("FTC" or "Commission") in Washington, D.C., in the Health Care Division of the Bureau of Competition. I am assigned to the FTC's investigation into potential anticompetitive conduct by the U.S.'s largest pharmacy benefit managers ("PBMs") (FTC File No. 2410005), which includes the civil investigative demand ("CID") issued to Respondent CVS Health Corporation ("CVS" or "Respondent") on December 8, 2023.

2.      I am authorized to execute a declaration verifying the facts that are set forth in the Petition to Enforce Civil Investigative Demand. I have read this petition and the attached exhibits and confirm that the exhibits are true and correct copies of the original documents or are excerpts of the true and correct copies. The facts set forth in this declaration are based on my personal knowledge or information that I have learned during the FTC's investigation.

3.      CVS is a healthcare conglomerate and the parent company of Caremark Rx, L.L.C., a PBM operating as CVS Caremark ("Caremark"), and CVS Pharmacy, Inc., which owns and operates retail, mail, and specialty pharmacies. CVS, Caremark, and CVS Pharmacy all have their principal place of business at One CVS Drive, Woonsocket, Rhode Island, and transact business nationwide, including in the District of Columbia. Caremark is the largest PBM in the U.S., and CVS operates the largest chain of retail pharmacies and the largest specialty pharmacy in the U.S.

4.      The FTC initiated this investigation in fall 2023 following numerous complaints from pharmacies, patients, and other market participants of potentially anticompetitive practices,

including imposing oppressive terms and fees on unaffiliated pharmacies—those not owned by CVS—through take-it-or-leave-it contracts required to join CVS's pharmacy networks; incentivizing or requiring beneficiaries to fill prescriptions at CVS's own affiliated pharmacies; and targeting unaffiliated pharmacies with pretextual audits.

5.     The investigation seeks to determine whether any pharmacy-related conduct by CVS or the conglomerates operating the other two largest PBMs violates any of the laws enforced by the FTC. To answer this question, Staff needs to understand CVS's power in the markets for PBM and pharmacy services; the relationship between CVS's PBM and pharmacy businesses; CVS's pharmacy-network contracting practices and terms; and whether, how, and why CVS steers prescriptions to CVS-affiliated pharmacies.

6.     To aid in this investigation, the Commission issued a CID to CVS on December 8, 2023, pursuant to FTC Resolution P210100. The CID was signed pursuant to Section 2.7(a) of the FTC's Rules of Practice. 16 C.F.R. § 2.7(a). The FTC served CVS a courtesy copy of the CID via email on December 8, 2023, and formally served CVS via expedited delivery service on December 13, 2023. The CID set January 8, 2024 as the deadline for CVS to comply.

7.      The CID specifications require CVS to produce documents, data, and narrative responses that will assist Staff in determining whether CVS's business practices in the PBM and pharmacy services industries violate any of the laws enforced by the FTC. In particular, it seeks information relating to: (a) CVS's corporate structure and finances (Specifications 1-7); (b) executive discussions of pharmacy services and pharmacy benefit management services (Specification 8-12); (c) data related to pharmacy services and pharmacy benefit management services (Specifications 13-18); (d) fees and payments made to pharmacies and other similar entities (Specifications 19-24); (e) how CVS builds pharmacy networks, including its contracting

practices with and evaluation of participating pharmacies (Specifications 25-31); (f) pharmacy audits (Specification 32); (g) completed or contemplated transactions relating to pharmacy services (Specification 33); (h) CVS's use of and relationships with specialty and mail order pharmacies, including CVS's efforts to require or encourage patients to use its affiliated pharmacies (Specifications 34-39); and (i) CVS's corporate practices for document preservation and process for complying with the CID (Specifications 40-43).

8.      The CID also informed CVS that it must file a petition to limit or quash the CID within 20 days of service and certify that its responses are complete by completing the Form of Certificate of Compliance set forth on the back of the CID form or by signing a declaration under penalty of perjury pursuant to 28 U.S.C. § 1746. Pet. Ex. 2 at 1-2.

9.      CVS did not petition the Commission to quash or limit the scope of the CID under the procedure outlined in Rule 2.10 of the FTC's Rules of Practice. 16 C.F.R. § 2.10. The deadline to move to quash or limit the scope passed on December 28, 2023, and CVS did not request an extension.

10.      The FTC Health Care Division's PBM investigation is separate and distinct from a market study of the PBM industry that the Commission authorized staff from the Office of Policy Planning (OPP) to conduct in June 2022. That study is pursuant to Section 6(b) of the FTC Act, which allows the FTC to study an industry and its market dynamics. 15 U.S.C. § 46(b). The Commission issued an order ("6(b) Order") to Caremark Rx, L.L.C. on June 6, 2022, seeking information to further this study.

11.      By statute, the 6(b) Order does not seek documents or data created after the date the order was issued. Moreover, the 6(b) Order only seeks materials in possession, custody, or control of Caremark, the PBM subsidiary, and not materials possessed by its parent CVS or by other CVS

affiliates or subsidiaries to which Caremark does not itself have access. The 6(b) Order also sought information on numerous subjects not required by the CID, such as documents and data relating to formulary management and manufacturer rebate contracting.

12.     Whereas the 6(b) Order only solicited responsive materials through June 6, 2022, the CID requires CVS to produce responsive materials through "30 days before the date on which the company provides the Commission with its final document submission [and] the executed certification form." Pet. Ex. 2 at 18 (Instruction I 2). The certification form requires CVS to attest that CVS has identified all responsive information in its possession, custody, or control and that it has either provided such information to the FTC or, "for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information." Pet. Ex. 2 at 28. In addition, the CID seeks information on numerous subjects not covered by the 6(b) Order. To the extent that the requested information in the 6(b) Order and CID overlap, however, FTC Staff sought to minimize the burden on CVS of complying with the CID by allowing CVS to simply re-produce or identify as responsive the documents it had already produced in response to the 6(b) Order.

13.     As described in more detail in the paragraphs that follow, over the 13 months since the CID was issued, CVS has made minimal progress responding to the CID. In the first nine months, CVS did not produce any documents specific to this investigation other than organizational information and a list of pharmacy audits. To date, CVS has produced no data and fewer than 1,000 documents that specifically respond to the CID and that were not also produced in response to the 6(b) Order.

14.     Staff requested a meeting with CVS to discuss the CID in its December 8, 2023 email attaching a courtesy copy of the CID. Having not heard back from CVS, Staff again requested a

meeting on December 19, 2023. CVS responded on December 19, 2023, requesting to defer any meeting until January 2024 despite the CID's original deadline to comply by January 8, 2023.

15.     In the same December 19, 2023 email to Staff, CVS stated that its productions in response to the 6(b) Order would substantially suffice for responding to the CID. Despite the 6(b) Order's cutoff date of June 2022, CVS asked that Staff review its materials produced in response to the 6(b) Order before meeting to discuss the CID.

16.     At the first meet and confer with CVS on January 4, 2024, Staff agreed that CVS could identify relevant documents produced in response to the 6(b) Order as responsive to the CID without reproducing those documents in the investigation. But Staff emphasized that, because CVS's responses to the 6(b) Order would not include materials created after June 2022 or materials responsive to the numerous CID specifications that do not overlap with the 6(b) Order's requests, CVS must produce new custodial documents, updated non-custodial documents, and additional data and narrative responses. Staff reiterated these requirements in a January 8, 2024 letter, in which the FTC also extended the deadline to comply with the CID to February 9, 2024.

17.     At the next meet and confer on January 26, 2024, CVS agreed to: (1) propose a custodian list and search terms to respond to the CID by February 2, 2024; (2) produce data updated through 2022 for Specifications 16-18 by February 6, 2024; and (3) investigate how long it would take CVS to update data originally produced in response to the 6(b) Order for Specifications 16-18 and to produce data responsive to Specifications 13-15.

18.     Based on these commitments, the FTC extended the deadline to comply with the CID to March 11, 2024. CVS never requested another deadline extension and has since been out of compliance with the CID.

19.    In a February 2, 2024, email to FTC Staff, CVS proposed searching the documents of nine custodians, all of whom overlapped with the 6(b) Order, using the same search terms as those used in the 6(b) Order for the specifications it deemed also responsive to the CID, and for a date range limited to the dates of the 6(b) Order. That is, CVS proposed that it produce no documents that it would not also produce in response to the 6(b) Order. CVS claimed that additional custodians, search terms, or an end date after June 6, 2022 would likely delay its custodial productions since CVS could not rely solely on the document universe it generated for the 6(b) Order.

20.    Shortly thereafter—and repeatedly since—Staff requested that CVS promptly produce the additional documents and data required by the CID, as well as a timeframe for compliance. Staff made such requests in writing on February 8, March 28, April 8, July 24, and August 1, and reiterated and discussed them in meet and confers on February 26, April 9, April 30, May 28, July 30, and August 13. Staff also repeatedly stated that CID compliance required additional custodians, different search terms, and a broader relevant time period than the 6(b) Order.

21.    Despite FTC Staff's persistent and good-faith efforts to negotiate CVS's compliance with the CID for over a year, to date CVS has produced less than 1,000 documents uniquely responsive to the CID, all in September 2024. Aside from one data sample it produced in August 2024, CVS has produced no data that was not also produced in response to the 6(b) Order.

22.    CVS stated at an April 9 meet and confer that Staff could expect productions of updated non-custodial documents in May and June 2024. CVS subsequently notified Staff at a May 14 meet and confer that CVS would no longer meet this timing but did not provide an updated estimate as to when Staff could expect these productions.

23.     In a May 31, 2024 email, CVS stated it tentatively agreed to search the documents of 24

total custodians, 16 of whom were 6(b) Order custodians, and four of whom are successors to

four 6(b) Order custodians. But—despite Staff proposing in two May 2024 meet and confers that

CVS only search documents from June 2022 or later for 20 of the 24 custodians—CVS refused

to commit to producing any documents created later than December 2023 after completing its

document collection.[1]

24.     In a July 8, 2024 email, CVS stated that although it was still collecting custodial

documents, the FTC's proposed search terms yielded approximately 1.5 million documents. CVS

then proposed narrower search terms that CVS stated yielded approximately 500,000 documents.

25.     On July 15, 2024, Staff proposed search terms intended to return a document set of

approximately the same size as that returned by CVS's proposal. CVS agreed to Staff's proposal

at a meet and confer on July 30, 2024, by which time CVS had substantially completed its

productions in response to the 6(b) Order. Staff memorialized this agreement in an August 1,

2024 email.

26.     On a call on August 20, 2024, CVS agreed to produce: (1) the following week, a data

sample for Specifications 13-15 that Staff and CVS discussed at the July 30 meet and confer; (2)

the first week of September, updated non-custodial documents; (3) by October 31, 2024, updated

data for Specifications 16-18; and (4) beginning September 20, 2024, custodial documents not

also produced in response to the 6(b) Order. CVS also agreed to substantially complete its

---

[1] At a meet and confer on May 14, 2024, CVS asserted that Staff's March 28 custodian proposal—which CVS had not accepted—modified CVS's obligation under the CID to produce documents through 30 days before the date CVS certified compliance. Staff informed CVS at the meet and confers and in writing in a June 11, 2024, letter that that the time period limitation offered in the prior proposal plainly did not modify the CID's requirements and that the CID still required CVS produce custodial documents in accordance with the time period set by CID. CVS had never accepted the March 28 proposal in whole.

production of certain priority custodial documents by October 31, 2024. On September 5, 2024, CVS reiterated its commitment to meet this timeline.

27.    On August 22, 2024, CVS produced a data sample for Specifications 13-15.

28.    At an August 22, 2024 meet and confer, CVS—for the first time—requested a formal modification to the CID's end date for custodial documents. Absent formal modification, the CID requires CVS to produce documents created up to 30 days before CVS certifies compliance. In an August 26, 2024, letter, Staff offered to modify the end date to the latter of August 26, 2024 or the date on which CVS completes its final pull of potentially responsive documents on the condition that CVS committed to Staff's proposed compliance timeline. Staff repeatedly requested CVS reply to Staff's proposal. A month later, on September 26, 2024, CVS rejected Staff's proposal.

29.    Instead, in a September 26, 2024 letter, CVS offered its own expected timeline for CID compliance and claimed that it would produce responsive materials on a rolling basis. Specifically, CVS stated it expected to produce: (1) data for Specifications 13-18 updated through 2023 by November 22, 2024; (2) a substantial volume of priority custodial documents by December 18, 2024; (3) a substantial volume of remaining custodial documents by January 31, 2025; and (4) any remaining requested materials by February 28, 2025. CVS also stated that it would not commit to producing custodial documents created any later than April 1, 2024.

30.    CVS produced 550 non-custodial documents on September 6, 2024, and 431 custodial documents on September 23, 2024. CVS has made no further production.

31.    On October 16, 2024, the Commission issued a subpoena ad testifacandum ("SAT") to CVS for testimony regarding CVS's efforts to timely comply with the CID pursuant to FTC Rule 2.7(h) to better inform Staff's continued efforts to obtain compliance. CVS informed Staff at an

October 21, 2024 meet and confer that CVS was considering filing a petition to quash the SAT, but that CVS would still attempt to meet the expected timeline for complying with the CID that CVS provided on September 26.

32.      On October 24, 2024, CVS filed a petition to quash the SAT with the Commission.

33.      On December 3, 2024, the Commission denied CVS's petition and ordered CVS to appear to testify on December 20, 2024, or at another time as Staff may determine. On December 10, 2024, CVS informed Staff by email and without explanation that it would not appear on December 20, 2024. On December 10 and December 12, 2024, Staff offered four alternative dates: December 18, December 19, January 3, and January 6, all of which CVS rejected.

34.      CVS failed to meet the first two expected production targets identified in its September 26 letter. Given CVS's year of delays, repeated failures to meet negotiated timelines, and total lack of any production since September, FTC Staff cannot rely on any CVS representation for future compliance with the CID without judicial intervention. CVS's failure to comply with the CID has prevented the Commission from completing its investigation in a timely manner, has burdened the Commission's scarce public resources, and is significantly hindering the Commission's ability to carry out its investigation into whether CVS's business practices violate the law.

35.      CVS has not made any relevance objections to the CID's requests, nor has CVS substantiated any claim of undue burden to comply with its outstanding obligations, especially in light of Staff's numerous concessions.

36.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 14, 2025                    /s/ Logan Wilke
                                                 Logan Wilke
                                                 Attorney
                                                 Health Care Division
                                                 Bureau of Competition
                                                 Federal Trade Commission

# Exhibit 2

# *CIVIL INVESTIGATIVE DEMAND*

| 1. TO | | 1a. MATTER NUMBER |
|---|---|---|
| CVS Health Corporation<br>c/o Andrea Zollett<br>Vice President and Senior Legal Counsel<br>2100 E. Lake Cook Road, 5th Floor<br>Buffalo Grove, IL 60089 | ▼ | FTC File No. 2410005 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

### 2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

### January 8, 2024 by 5:00 pm ET

### 3. SUBJECT OF INVESTIGATION

Whether conduct by CVS Health Corporation violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and whether Commission action to obtain injunctive relief would be in the public interest. See also attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Kara Monahan, Records Custodian<br>Nicholas Leefer, Deputy Records Custodian | Nicholas Leefer, Amanda Triplett, Alpa Davis, Evan Cartagena, Michael Goldenberg, Logan Wilke |

| DATE ISSUED<br>12/08/2023 | COMMISSIONER'S SIGNATURE<br>*Lina Khan* |
|---|---|

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 11/17)

# Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature  _____

Title  _____

Sworn to before me this day

_____  _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

**CIVIL INVESTIGATIVE DEMAND
ISSUED TO CVS HEALTH CORPORATION
FTC FILE NO. 2410005**

Unless modified by agreement with the staff of the Federal Trade Commission (the "Commission" or the "FTC"), each Specification of this Civil Investigative Demand ("CID") requires a complete search of the company as defined in the Definitions, which appear after the following Specifications. Pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(k), company representatives must confer with the Commission representative identified in the final instruction of this CID within fourteen days after receipt of this CID. If the company believes that the required search or any other part of this CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative. All modifications to this CID must be agreed to in writing pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(l).

**SPECIFICATIONS**

For the period of January 1, 2017 to present, please provide the following:

## I.    Organizational Information

1.    Identify the Company's subsidiaries, parent companies, any other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for PBM Services.

2.    Identify the Company's subsidiaries, parent companies, any other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for Pharmacy Services.

3.    For each of the Company's subsidiaries, parent companies, other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for PBM Services, identify the following:

    a)    The interest in or responsibility relating to PBM Services;

    b)    The ownership type and structure (e.g., corporation, LLC, etc.);

    c)    Where the entity is incorporated or otherwise registered;

    d)    The location(s) of the entity's offices and other facilities; and

    e)    The business(es) in which the entity is engaged.

Submit and identify by Bates number documents sufficient to support your response.

4.    For each of the Company's subsidiaries, parent companies, other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for Pharmacy Services, identify the following:

1

    a)    The interest in or responsibility relating to Pharmacy Services;

    b)    The ownership type and structure (e.g., corporation, LLC, etc.);

    c)    Where the entity is incorporated or otherwise registered;

    d)    The location(s) of the entity's offices and other facilities; and

    e)    The business(es) in which the entity is engaged.

Submit and identify by Bates number documents sufficient to support your response.

5.      Submit one copy of each organizational chart and personnel directory for the Company as a whole (including domestic and international entities) and for each of the Company's divisions or business segments involved, directly or indirectly, in any activity relating to (a) PBM Services and (b) Pharmacy Services.

6.      Submit a list of all agents, representatives, and intermediaries acting on behalf of the Company, including but not limited to, all consultants, product distributors, sales agents, and other Persons involved in any capacity relating to PBM Services.

For each agent, representative, or intermediary identified in response to this Specification, include their title, a description of their role and reporting structure, and a description of any records, documents, or data maintained by that agent, representative, or intermediary relating to PBM Services.

7.      Provide each financial statement, budget, profit and loss statement, cost center report, performance report, forecast, and any other financial or operational report regularly prepared by or for the Company on a periodic basis, including but not limited to reports for the Company as a whole and for each of the Company's divisions or business segments involved in (a) PBM Services and (b) Pharmacy Services.

8.      Provide a list of members of the Company's board of directors or board of trustees, including each member's name, address, occupation, and period of service.

9.      Submit one copy of all meeting minutes and related presentations to the Company's board of directors or board of trustees relating to PBM Services.

10.    Submit one copy of all meeting minutes and related presentations to the Company's board of directors or board of trustees relating to Pharmacy Services.

11.    Submit one copy of all meeting minutes and related presentations to meetings of the Company's senior executives relating to PBM Services.

12.    Submit one copy of all meeting minutes and related presentations to meetings of the Company's senior executives relating to Pharmacy Services.

### II.    Payments to and from Relevant Entities, Including DIR Fees and Reimbursement

13.    For each year, provide the following data for each Relevant Entity, including:

a)    Pharmacy Name;

b)    NCPDP Provider ID;

c)    Whether the Relevant Entity is Company-owned or affiliated;

d)    Whether the Relevant Entity uses pharmacy services administrative organizations (PSAOs) and if so, which ones are used;

e)    Whether the Relevant Entity is a Retail Pharmacy, Chain Pharmacy, Specialty Pharmacy, Independent Pharmacy, Mail-Order Pharmacy or other type of pharmacy;

f)    Address of Relevant Entity, (including zip code and latitude and longitude); and

g)    By payer type (Commercial, Medicare, Medicaid, other), and separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

  i.    Total 30-Day Equivalent Prescriptions;

  ii.    Total AWP;

  iii.    Total WAC;

  iv.    Total payment to the Relevant Entity for Prescriptions, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments; and

  v.    Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.).

14.    For each year, provide the following information for each Pharmacy Network:

a)    Pharmacy Network Name;

b)    Network ID;

c)    Number of lives or beneficiaries associated with the network;

d)    Network type (e.g., open, preferred, limited);

e)    Number of pharmacy locations included in the network; and

3

    f)    Separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

        i.    Total 30-Day Equivalent Prescriptions;

        ii.    Total AWP;

        iii.    Total WAC;

        iv.    Total payment to Relevant Entities for Prescriptions, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments;

        v.    Any terms, metrics, or criteria used to calculate each type of payment to the Relevant Entities in the Pharmacy Network;

        vi.    Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.); and

        vii.    Any terms, metrics or criteria used to calculate each type of Post-Sale Adjustment.

15.    For each year, provide the following information for each Relevant Entity within each Pharmacy Network:

    a)    Pharmacy Network Name;

    b)    Network ID;

    c)    Pharmacy Name;

    d)    NCPDP Provider ID;

    e)    Network status (e.g., Preferred Pharmacy status); and

    f)    Separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

        i.    Total 30-Day Equivalent Prescriptions;

        ii.    Total AWP;

        iii.    Total WAC;

        iv.    Total payment to the Relevant Entity, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments;

     v.   Any terms, metrics, or criteria used to calculate each type of payment to the Relevant Entity;

    vi.   Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.); and

   vii.   Any terms, metrics or criteria used to calculate each type of Post-Sale Adjustment.

16.    For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each of the top 100 drugs by annual Total Amount Paid to all Relevant Entities by the Company:

    a)   Drug name (including all doses and dosage forms);

    b)   NDC(s);

    c)   Pharmacy Name;

    d)   NCPDP Provider ID;

    e)   Payer Type (Commercial, Medicare, Medicaid, or All Other);

    f)   Quantity Dispensed;

    g)   Number of 30-Day Equivalent Prescriptions;

    h)   Total Amount Paid (to Relevant Entity);

    i)   Ingredient Cost Paid (to Relevant Entity);

    j)   Dispensing Fee Paid (to Relevant Entity);

    k)   Incentive Amount Paid (to Relevant Entity);

    l)   Other Amount Paid (to Relevant Entity);

    m)   Flat Sales Tax Amount Paid (to Relevant Entity);

    n)   Percentage Sales Tax Amount Paid (to Relevant Entity);

    o)   Patient Pay Amount (to Relevant Entity);

    p)   Other Payer Amount Recognized (to the Relevant Entity);

    q)   Total amount billed to Plan Sponsor;

r)  Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)  Spread Price Amount retained by the Company; and

t)  Post-Sale Adjustments attributed to this drug product, listing separately the totals for each type of adjustment.

17. For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each of the top 100 drugs by annual total number of 30-day equivalent prescriptions at all Relevant Entities:

a)  Drug name (including all doses and dosage forms);

b)  NDC(s);

c)  Pharmacy Name;

d)  NCPDP Provider ID;

e)  Payer Type (Commercial, Medicare, Medicaid, or All Other);

f)  Quantity Dispensed;

g)  Number of 30-Day Equivalent Prescriptions;

h)  Total Amount Paid (to Relevant Entity);

i)  Ingredient Cost Paid (to Relevant Entity);

j)  Dispensing Fee Paid (to Relevant Entity);

k)  Incentive Amount Paid (to Relevant Entity);

l)  Other Amount Paid (to Relevant Entity);

m)  Flat Sales Tax Amount Paid (to Relevant Entity);

n)  Percentage Sales Tax Amount Paid (to Relevant Entity):

o)  Patient Pay Amount (to Relevant Entity);

p)  Other Payer Amount Recognized (to Relevant Entity);

q)  Total amount billed to Plan Sponsor;

r)  Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)  Spread Price Amount retained by the Company; and

t)  Post-Sale Adjustments attributed to this drug product, listing separately the totals for each type of adjustment.

18.  For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each drug on the Company's Specialty Drug List:

a)  Drug name (including all doses and dosage forms);

b)  NDC(s);

c)  Pharmacy Name;

d)  NCPDP Provider ID;

e)  Payer Type (Commercial, Medicare, Medicaid, or All Other);

f)  Quantity Dispensed;

g)  Number of 30-Day Equivalent Prescriptions;

h)  Total Amount Paid (to Relevant Entity);

i)  Ingredient Cost Paid (to Relevant Entity);

j)  Dispensing Fee Paid (to Relevant Entity);

k)  Incentive Amount Paid (to Relevant Entity);

l)  Other Amount Paid (to Relevant Entity);

m)  Flat Sales Tax Amount Paid (to Relevant Entity);

n)  Percentage Sales Tax Amount Paid (to Relevant Entity):

o)  Patient Pay Amount (to Relevant Entity);

p)  Other Payer Amount Recognized (to Relevant Entity);

q)  Total amount billed to Plan Sponsor;

r)  Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)  Spread Price Amount retained by the Company; and

t)   Post-Sale Adjustments attributed to these drug products, listing separately the totals for each type of adjustment.

19.   Submit all documents relating to DIR Fees paid by or to Relevant Entities, including but not limited to related performance or quality metrics for Relevant Entities.

20.   Submit all documents relating to Post-Sale Adjustments not encompassed in Specification 19 related to the dispensing of prescription drugs or the provision of Pharmacy Services.

21.   Submit all documents relating to reimbursements and other payments to each Relevant Entity related to the dispensing of prescription drugs or the provision of Pharmacy Services.

22.   Submit all documents relating to the Company's strategies or plans relating to DIR Fees, Post-Sale Adjustments, and reimbursements, including but not limited to any changes the Company has made or plans to make.

23.   Submit all documents relating to the final CMS rule published in the Federal Register on May 9, 2022 (87 Fed. Reg. 27704 through 27902), adopting a new definition of "negotiated price" at 42 CFR §432.100, including but not limited to documents discussing the Company's plans to comply with the rule, reimbursement rates, and any other contract terms offered to Relevant Entities for Medicare Part D drugs.

24.   Submit all communications relating to DIR Fees, Post-Sale Adjustments, or reimbursements with trade associations, PBMs, and any agents or consultants that determine or provide input on DIR Fees, Post-Sale Adjustments, or reimbursements.

### III.   Pharmacy Network Participation

25.   One copy of each of the Company's contracts (including all addenda, amendments, or modifications) with Relevant Entities relating to (a) PBM Services and (b) Pharmacy Services.

26.   One copy of each of the Company's provider manuals applicable to Relevant Entities.

27.   Submit all documents relating to rules or requirements for Pharmacy Network participation, or Preferred Pharmacy status, and any participation limits, fees, or restrictions for Relevant Entities.

28.   Submit all documents relating to all Relevant Entities that were denied or terminated from participation, rejected an offer to participate, or were denied the opportunity to discuss participation in the Company's Pharmacy Network, including as a Preferred Pharmacy.

29.   Submit all documents relating to the assessment of quality, cost, or performance of each of the Relevant Entities.

30.   Submit all documents relating to Pharmacy Network participation, including but not limited to communications with Relevant Entities and decisions regarding Pharmacy Network participation and Preferred Pharmacy status.

31.   Submit all documents relating to Pharmacy Network design, strategic plans, and assessments of the Company's comparative performance with any other company.

## IV.    Audits and Transactions Involving Pharmacies

32.   Submit all documents relating to audits of Relevant Entities.

33.   Identify any Transaction involving a Relevant Entity contemplated, evaluated, discussed, planned, considered, or completed by the Company and submit all documents relating to any such Transaction.

## V.    Specialty, Mail-Order, and Affiliated Pharmacies

34.   Submit all documents relating to the Company's policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs.

35.   For each quarter, provide a list of all drugs defined or designated as Specialty Drugs on any formulary administered by the Company and identify whether each such drug has been designated as Brand or Generic.

36.   Submit all documents relating to any efforts to require, direct, encourage, or incentivize patients to utilize Specialty or Mail-Order Pharmacy, including those owned or affiliated with the Company. Such efforts could include but are not limited to co-pay differentials, availability of 90-day refills, shipping charge differentials, pricing differentials, express shipping availability, simplified ordering, patient communication or reminder policies, or other service or any other financial or non-financial incentives.

37.   Submit all documents relating to any efforts to require, direct, encourage, or incentivize patients to utilize a Retail Pharmacy owned or affiliated with the Company. Such efforts could include but are not limited to co-pay differentials, availability of 90-day refills, shipping charge differentials, pricing differentials, express shipping availability, simplified ordering, patient communication or reminder policies, or other service or any other financial or non-financial incentives.

38.   Submit all of the Company's contracts (including all addenda, amendments, or modifications) or policies regarding internal transfer pricing by the Company and any Relevant Entity owned by or affiliated with the Company.

39.   Submit all documents relating to policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs with trade associations, PBMs, and any agents or consultants that determine or provide input on the policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs.

## VI.    Miscellaneous

40.    Submit documents sufficient to show and, to the extent not reflected in such documents, describe in detail the Company's policies and procedures relating to the retention and destruction of documents and data.

41.    Submit documents sufficient to show, and to the extent not reflected in such documents, describe in detail the Company's policies and procedures relating to keeping non-public information regarding Relevant Entities obtained in the course of delivering PBM Services separate from subsidiaries or affiliated business engaged in the delivery of Pharmacy Services.

42.    Submit all information described in Instructions below, and any additional instructions necessary for the Commission to use or interpret the data and information submitted in response to this CID.

43.    Submit the name(s) and title(s) of the person(s) responsible for preparing the response to this CID and a copy of all instructions prepared by the Company relating to the steps taken to respond to this CID. Where oral instructions were given, identify the individual who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given.

## DEFINITIONS

1.    The terms "and" and "or" have both conjunctive and disjunctive meanings.

2.    The term "AWP" means average wholesale price.

3.    The term "Brand" or "Brand Drug" means a drug approved by the FDA under a New Drug Application (NDA) or Biologic License Application (BLA).

4.    The terms "Chain" and "Chain Pharmacy" means any business entity that owns four or more pharmacy locations nationwide, either under a single banner or multiple banners, and any individual pharmacy locations within such business entity.

5.    The term "Communication" means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

6.    The term "the Company" or "Company" means CVS Health Corporation, its domestic and foreign parents, predecessors, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, principals, employees, agents, and representatives of the foregoing.

7.    The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. Thus, the Company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mobile devices,

mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off Company premises. If the Company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this Definition with the Commission representatives identified on the last page of this Request. The Commission representative will consider modifying this Definition to:

a)   exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the Company;

b)   limit the portion of backup disks and tapes and archive disks and tapes that needs to be searched and produced to certain key individuals, or certain time periods or certain Specifications identified by Commission representatives; or

c)   include other proposals consistent with Commission policy and the facts of the case.

d)   The term "Person" includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

8.    The term "DIR Fee" means all direct and indirect remuneration fees and price concessions or adjustments that impact prescription drug costs that are not captured at the point of sale.

9.    The term "Dispensing Fee Paid (to Relevant Entity)" refers to the amount reported as paid to the pharmacy in NCPDP Field #507-F7.

10.   The term "documents" means any information, on paper or in electronic format, including written, recorded, and graphic materials of every kind, in the possession, custody, or control of the Company. (However, your response as it relates to separately incorporated subsidiaries or affiliates should only include information from or about such entities if you already have access to it, including information maintained in a central data repository. You should not otherwise seek any responsive information from separately incorporated subsidiaries or affiliates.) The term "documents" includes, without limitation: computer files; email messages; audio files; text messages, instant messages; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person's files; and copies of documents the originals of which are not in the possession, custody, or control of the Company.

11.   Unless otherwise specified, the term "documents" excludes:

a)   bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature;

    b)   architectural plans and engineering blueprints;

    c)   documents solely relating to environmental, tax, OSHA, or ERISA issues; and

    d)   relational and enterprise databases, except as required to comply with an individual Specification.

12.    The term "drug" includes all "small molecule" drugs and biological products approved by the U.S. Food & Drug Administration (FDA).

13.    The term "Flat Sales Tax Amount Paid (to Relevant Entity)" refers to the amount reported as paid to the pharmacy in NCPDP Field #558-AW.

14.    The term "formulary" means any list of prescription drugs that describes the circumstances under which the Company will reimburse particular drug products.

15.    The term "Generic" or "Generic Drug" means any FDA-approved drug that was approved based on bioequivalence or biosimilarity to a preexisting drug product, including any authorized generic products.

16.    The term "Incentive Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #521-FL.

17.    The term "Independent Pharmacy" means any business entity that owns less than four pharmacy locations nationwide, either under a single banner or multiple banners, and any individual pharmacy locations within such business entity.

18.    The term "Ingredient Cost Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #506-F6.

19.    The term "Mail Order Pharmacy" means any pharmacy that primarily dispenses prescription drugs to patients or patients' designees via the United States Postal Service, a common carrier, or a delivery service. The term does not include Specialty Pharmacies.

20.    The term "NDC" means the National Drug Code.

21.    The term "Other Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #565-J4.

22.    The term "Other Payer Amount Recognized (to the Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #566-J5.

23.    The term "Patient Pay Amount (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #505-F5.

24.    The term "Pharmacy Services" means services related to home delivery services or mail-order pharmacy services, retail pharmacy services, Specialty Pharmacy, community health pharmacy services.

25.    The term "PBM Services" means all services related to the creation, operation, and administration of Pharmacy Networks to fulfill and reimburse prescriptions for beneficiaries of a Pharmacy Benefits Plan. These services include but are not limited to the negotiation and determination of reimbursement amounts, payments, fees, performance metrics or criteria, and terms of service or network participation for Relevant Entities.

26.    The term "Percentage Sales Tax Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #559-AX.

27.    The term "Pharmacy Benefits Plan" or capitalized "Plan" means any pharmacy benefit product issued, administered, or serviced by the Company under which covered individuals are entitled to any reimbursement for prescribed Drugs. For clarification, a Plan may include commercial, capitated Medicaid, capitated Medicare, or qualified health plans with coverage for prescription drugs under an open, closed, or multi-tiered formulary.

28.    The term "Pharmacy Network" means a collection of Relevant Entities that beneficiaries within a Pharmacy Benefits Plan are required or incentivized to use to obtain reimbursement for the costs of prescription drugs.

29.    The uncapitalized term "plan" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

30.    The term "Plan Sponsor" means any business entity (e.g. self-funded employer, insurance company, union health plan) that is financially liable for prescription drug purchases on behalf of individuals pursuant to a Pharmacy Benefits Plan. Each Plan sponsor may offer multiple Pharmacy Benefit Plans.

31.    The term "Post-Sale Adjustment" means any additional compensation or reduction in compensation exchanged between the Company and a pharmacy after the point-of-sale transaction that changes the amount of a pharmacy was reimbursed for a prescription or related service.

32.    The term "Preferred Pharmacy" means any Relevant Entity that beneficiaries within a Pharmacy Benefits Plan are incentivized to use for prescription fulfillment.

33.    The term "Prescription" refers to the dispensing of a 30-day supply of a particular prescription drug product. In case of ambiguity, 90-day prescriptions requiring only one co-payment shall be counted as three Prescriptions.

34.    The term "Quantity Dispensed" means the number of units, grams, milliliters, or other relevant unit indicating the amount of an individual drug product included in a transaction or transactions.

35.     The uncapitalized term "reimbursement" means amounts paid to a pharmacy by a PBM for a dispensed drug or prescription service, including dispensing fees, patient copays, coinsurance, and other fees, payments, or discounts.

36.     The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

37.     The term "Relevant Entity" includes all Retail Pharmacies, Chain Pharmacies, Independent Pharmacies, Specialty Pharmacies, long term care pharmacies, Pharmacy Services Administrative Organizations, and Mail-Order Pharmacies that dispense prescription drugs, including any Company-owned or affiliated pharmacies.

38.     The term "Retail Pharmacy" means any pharmacy that generally dispenses prescription drugs to patients in person. For avoidance of doubt, this term excludes both Specialty Pharmacies and Mail Order Pharmacies.

39.     The term "Specialty" or "Specialty Drug" means any drug product that has been included on any of the Company's Specialty Drug Lists (or any similar term or list indicating particular dispensing requirements) by the Company.

40.     The term "Specialty Drug List" means any list of prescription drugs that are referenced as "specialty" drugs (or any similar term indicating heightened requirements for pharmacies dispensing such drug products) by the Company.

41.     The term "Specialty Pharmacy" means a pharmacy that focuses primarily on dispensing FDA approved pharmaceuticals that are generally not dispensed by traditional retail pharmacies due to issues including but not limited to, those pharmaceuticals' special handling requirements, complex administration requirements, orphan drug status, high cost, complex patient monitoring requirements, and extensive insurance preapproval requirements.

42.     The term "Spread Price Amount" means the difference between the total amount paid by a PBM to a pharmacy for a prescription and the total amount paid by the Plan Sponsor to the PBM for the same prescription.

43.     The term "Total Amount Paid [to Relevant Entity]" means the amount reported as paid to the pharmacy in NCPDP Field #509-F9.

44.     The term "Transaction" means merger, acquisition (including asset purchases or acquisitions), consolidation, investment, joint venture, license, partnership, sale, or other transaction by or on behalf of the Company.

45.     The term "WAC" means wholesale acquisition cost.

46.     The term "30-Day Equivalent" refers to the method of prescription standardization outlined by CMS. If the days' supply reported on a prescription drug event is less than or equal to 34, the number of 30-day equivalent supplies equals one. If the days' supply reported on a prescription drug event is greater than 34, the number of 30-day equivalent

supplies is equal to the number of days' supply reported on each prescription drug event divided by 30.

# INSTRUCTIONS

For the purposes of this CID, the following Instructions apply:

I 1.    For each Specification marked with an asterisk (*), and to the extent any other responsive data exists electronically, provide your response(s) in an Excel spreadsheet with all underlying data un-redacted and all underlying formulas and algorithms intact, as specified in Instruction 8.

I 2.    Unless otherwise indicated, each Specification in this CID covers documents and information from January 1, 2017 through 30 days before the date on which the company provides the Commission with its final document submission, the executed certification form, and other compliance-related documents described in Instruction 15 (the "End Date"). The company shall preserve documents responsive to the CID created or received after the End Date until a Commission representative notifies the company that the investigation has ended.

I 3.    All references to year refer to calendar year.

I 4.    Unless otherwise specified, each Specification calls for information limited to the United States.

I 5.    Except for privileged material, the company will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. The company should submit any appendix, table, or other attachment by either attaching it to the responsive document or clearly marking it to indicate the responsive document to which it corresponds. Attachments must be produced along with the document to which they are attached, regardless of whether they have been produced separately. Except for privileged material, the company will not redact, mask, cut, expunge, edit, or delete any responsive document or portion thereof in any manner.

I 6.    Compliance with this CID requires a search of all documents in the possession, custody, or control of the company, including, without limitation, those documents held by any of the company's officers, directors, employees, agents, representatives, or legal counsel, whether or not such documents are on the premises of the company. If any person is unwilling to have his or her files searched, or is unwilling to produce responsive documents, the company must provide the Commission with the following information as to each such person: his or her name, address, telephone number, and relationship to the company.

I 7.    Do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with the Commission representative. If any document responsive to a particular Specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

The term "Sensitive PII" means an individual's Social Security Number alone; or an individual's name, address, or phone number in combination with one or more of the following:

- date of birth

- driver's license number or other state identification number, or a foreign country equivalent

- passport number

- financial account number

- credit or debit card number

The term "SHI" includes medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. SHI relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

I 8.   Form of Production: The company shall submit documents as instructed below absent written consent from the Commission representative.

a)   Documents stored in electronic or hard copy formats in the ordinary course of business shall be submitted in the following electronic format provided that such copies are true, correct, and complete copies of the original documents:

i)   Submit Microsoft Excel, Access, and PowerPoint files in native format with extracted text and metadata.

ii)   Submit emails in TIFF format with extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the email. |
| Bates End | Bates number of the last page of the email. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |

17

| Metadata/Document Information | Description |
|---|---|
| Custodian | Name of the person from whom the email was obtained. |
| Email BCC | Names of person(s) blind copied on the email. |
| Email CC | Names of person(s) copied on the email. |
| Email Date Received | Date the email was received. [MM/DD/YYYY] |
| Email Date Sent | Date the email was sent. [MM/DD/YYYY] |
| Email From | Names of the person who authored the email. |
| Email Message ID | Microsoft Outlook Message ID or similar value in other message systems. |
| Email Subject | Subject line of the email. |
| Email Time Received | Time email was received. [HH:MM:SS AM/PM] |
| Email To | Recipients(s) of the email. |
| Email Time Sent | Time email was sent. [HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Folder | File path/folder location of email. |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC0003090.txt |

iii) Submit email attachments other than those described in subpart (a)(i) in TIFF format. For all email attachments, provide extracted text and the following metadata and information as applicable:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of person from whom the file was obtained. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Native Link | Relative file path to submitted native or near native files. Example: \NATIVES\001\FTC0003090.xls |
| Parent ID | Document ID or beginning Bates number of the parent email. |
| Text Link | Relative path to submitted text file. |

19

| Metadata/Document Information | Description |
|---|---|
| | Example: \TEXT\001\FTC0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

iv) Submit all other electronic documents, other than those described in subpart (a)(i), in TIFF format accompanied by extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the original custodian of the file. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – |

| Metadata/Document Information | Description |
|---|---|
| | typically SHA1 or MD5. |
| Originating Path | File path of the file as it resided in its original environment. |
| Native Link | Relative path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls |
| Text Link | Relative path to submitted text file.<br><br>Example: \TEXT\001\FTC-0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

v) Submit documents stored in hard copy in TIFF format accomplished by OCR with the following information:

| Metadata/Document Information | Description |
|---|---|
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Bates number of the last page of the document. |
| Custodian | Name of person from whom the file was obtained. |

vi) Submit redacted documents in TIFF format accompanied by OCR with the metadata and information required by relevant document type in subparts (a)(i) through (a)(v) above. For example, if the redacted file was originally an attachment to an email, provide the metadata and information specified in subpart (a)(iii) above. Additionally, please provide a basis for each privilege claim as detailed in Instruction 10.

21

b) Submit data compilations in electronic format, specifically Microsoft Excel spreadsheets or delimited text formats, with all underlying data un-redacted and all underlying formulas and algorithms intact. Submit data separately from document productions.

c) Produce electronic file and TIFF submissions as follows:

    i) For productions over 10 gigabytes, use hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data in USB 2.0 or 3.0 external enclosure.

    ii) For productions under 10 gigabytes, CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats. Alternatively, the FTC's secure file transfer protocol service may be used; contact the Commission representative for further instructions to submit productions using this method.

    iii) All documents produced in electronic format shall be scanned for and free of viruses prior to submission. The Commission will return any infected media for replacement, which may affect the timing of the company's compliance with this CID.

    iv) Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

d) Each production shall be submitted with a transmittal letter that includes the FTC matter number; production volume name; encryption method/software used; list of custodians and document identification number range for each; total number of documents; and a list of load file fields in the order in which they are organized in the load file.

e) If the company intends to utilize any de-duplication or email threading software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media, or if the company's computer systems contain or utilize such software, the company must contact the Commission representative to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this CID.

I 9. All documents responsive to this CID:

a) shall be produced in complete form, un-redacted unless privileged, and in the order in which they appear in the company's files;

b) shall be marked on each page with corporate identification and consecutive document control numbers when produced in TIFF format (e.g., ABC-00000001);

22

c) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

d) shall be produced in color where necessary to interpret the document (if the coloring of any document communicates any substantive information, or if black-and-white photocopying or conversion to TIFF format of any document (e.g., a chart or graph), makes any substantive information contained in the document unintelligible, the company must submit the original document, a like-colored photocopy, or a JPEG-format TIFF);

e) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that the Commission representative determines prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request; and

f) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct, and complete copies of the original documents.

I 10.  If the company withholds any responsive document or masks or redacts any portion of any responsive document based on a claim of privilege or work-product immunity, the company must provide the Commission with a log describing the privilege claim and all facts supporting the claim sufficient to comply with Federal Trade Commission Rule of Practice § 2.11. 16 C.F.R. § 2.11. For each document withheld, masked, or redacted, the log shall list the following: (a) specific grounds for claim of privilege or immunity, (b) type of document, (c) title, (d) author(s), (e) date, (f) addressees and recipients of the original document or any copy thereof (including persons "cc'd" or "blind cc'd"), (g) a description of the subject matter, with sufficient detail to assess the claim of privilege, (h) a description identifying each attachment to the document, (i) the page length of the document, (j) the relevant specification(s), and (k) for redacted documents, the document control number (as described in Instruction 9). Additionally, for each document withheld under a claim of attorney work-product immunity, the log will list: (l) whether the document was prepared in anticipation of litigation or for trial, (m) the other parties or expected other parties to the litigation and whether that party is adverse, (n) case number, (o) complaint filing date, and (p) court name. For each person listed, the log will include the person's full name, address, job title, and employer or firm; for each non-company recipient, include such additional description sufficient to show that individual's need to know the information contained in the document. Please denote all attorneys with an asterisk ("*").

The privilege log shall be submitted as a Microsoft Excel file.

An attachment to a document must be entitled to privilege in its own right. If an attachment is responsive and not entitled to privilege in its own right, it must be provided. The company must provide all non-privileged portions of any responsive document for which a claim of privilege is asserted, noting where redactions in the document have been made. With respect to documents withheld on grounds of privilege that discuss or describe any U.S. or foreign patent, each individual patent identified in the withheld document must be specified by its patent number.

I 11.    If the company is unable to answer any question fully, supply such information and data as are available. Explain why the answer is incomplete, the efforts made by the company to obtain the information and data, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

I 12.    If documents responsive to a particular Specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Specification(s) to which they are responsive, and identify the persons having knowledge of the content of such documents.

I 13.    Do not destroy or dispose of documents responsive to this CID, or any other documents relating to the subject matter of this CID. The destruction or disposal of such documents during the pendency of this investigation might constitute a felony in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 1512.

I 14.    In order for the company's response to this CID to be complete, the attached certification form must be executed by the company official supervising compliance with this CID, notarized, and submitted along with the responsive materials.

I 15.    Compliance with this CID requires the company to submit to the Commission, on or before 30 days from the date on which this CID is signed, all responsive documents, data, information and the following:

a)    Executed and notarized certification form, which is included herewith;

b)    Privilege log according to Instruction 10, if any responsive documents are withheld or redacted;

c)    List of any persons (by name, address, telephone number, and relationship to the company) whose files have not been searched according to Instruction 6; and

d)    For each document submitted, information sufficient to identify the name of the person from whose files the document was obtained (document custodian), according to Instruction 9.

I 16.   Any questions you have relating to the scope or meaning of anything in this CID or suggestions for possible modifications thereto should be directed to Nicholas Leefer at (202) 326-3573. Please provide responses to the above specifications in electronic format via email or secure FTP wherever possible. If providing responses via email, please send your responses to Nicholas Leefer (nleefer@ftc.gov) For electronic transmission of materials by secure FTP, please coordinate with the staff listed above for further instructions. All submissions by secure FTP must be accompanied by an email notification of said submission to nleefer@ftc.gov. If you wish to submit your response by other means, please coordinate with the staff listed above for further instructions.

## CERTIFICATION OF COMPLIANCE

### Pursuant to 28 U.S.C. § 1746

I, _____, certify the following with respect to the Federal Trade

Commission's ("FTC") Civil Investigative Demand directed to CVS Health Corporation (FTC

File No. 2410005) (the "CID"):

1. The Company has identified all documents, information, and/or tangible things ("respon-

    sive information") in the Company's possession, custody, or control responsive to the

    CID and either:

    a. provided such responsive information to the FTC; or

    b. for any responsive information not provided, given the FTC written objections

        setting forth the basis for withholding the responsive information.

2. I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____          _____

                                                Signature


                                                _____

                                                Printed Name


                                                _____

                                                Title

26

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     Lina M. Khan, Chair
Noah Joshua Phillips
Rohit Chopra
Rebecca Kelly Slaughter
Christine S. Wilson

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS**
**REGARDING ACTS OR PRACTICES**
**AFFECTING HEALTHCARE MARKETS**

**File No. P210100**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices in, or affecting commerce related to healthcare markets, including those regarding pharmaceuticals, pharmacies, pharmacy benefit managers, medical devices, hospitals, or other healthcare facilities or services, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it, including subpoenas and orders to file special reports, be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period..

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.*, and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued:  July 1, 2021**
**Expires:  July 1, 2031**

Exhibit 3



# *SUBPOENA AD TESTIFICANDUM*

| 1. TO | | 2. FROM |
|---|---|---|
| CVS Health Corporation<br>c/o Rani Habash, Esq.<br>Dechert LLP<br>1900 K Street, NW<br>Washington, DC 20006-1110 |  | UNITED STATES OF AMERICA<br>FEDERAL TRADE COMMISSION |

| 2a. MATTER NUMBER FTC File No. 2410005 |
|---|

This subpoena requires you to appear and testify at the request of the Federal Trade Commission at a hearing [or deposition] in the proceeding described below (Item 6).

| 3. LOCATION OF HEARING | 4. YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| IH will occur remotely via telephone or online videoconferencing<br><br>*In advance of hearing, please provide email addresses of all participants for invites and links | Maren Haneberg or other designated counsel |
| | 5. DATE AND TIME OF HEARING OR DEPOSITION |
| | October 24, 2024, at 9:00 a.m. ET, or at other date and time as agreed upon by FTC counsel and counsel for the witness |

6. SUBJECT OF INVESTIGATION

Efforts by CVS Health Corporation to timely comply with the Civil Investigative Demand issued to it on December 8, 2023; and the steps CVS Health Corporation took to preserve documents related to the Civil Investigative Demand. See Attachment A and attached resolution directing use of compulsory process.

| 7. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 8. COMMISSION COUNSEL |
|---|---|
| Lauren Peay, Records Custodian<br>Maren Haneberg, Deputy Records Custodian | Maren Haneberg, Randall Weinsten, and Logan Wilke |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 10/16/2024 | *Rebecca Kelly Slaughter* |

## INSTRUCTIONS AND NOTICES

The delivery of this subpoena to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. This subpoena does not require approval by OMB under the Paperwork Reduction Act of 1980.

## PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this subpoena be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 8.

## YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

## TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this subpoena should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this subpoena and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCsRulesofPractice. Paper copies are available upon request.

FTC Form 68-A (rev. 11/17)

**RETURN OF SERVICE**

*I hereby certify that a duplicate original of the within subpoena was duly served:*     *(check the method used)*

○  *in person.*

○  *by registered mail.*

○  *by leaving copy at principal office or place of business, to wit:*

_____

_____

_____

_____

*on the person named herein on:*

_____
(Month, day, and year)


_____
(Name of person making service)


_____
(Official title)

ATTACHMENT A
**SUBPOENA TO TESTIFY AT AN INVESTIGATIONAL HEARING
ISSUED TO CVS HEALTH CORPORATION
FTC FILE NO. 2410005**

Pursuant to Commission Rule 2.7(h), 16 C.F.R. § 2.7(h), this Subpoena to Testify at an Investigational Hearing ("Subpoena") requires the Company to designate one or more executives, employees, or managing agents, or designate other Persons who consent, to testify on its behalf with regard to each of the following matters. Unless the Company designates a single individual, the Company must designate in advance and in writing the matters on which each designee will testify. The Person(s) designated must testify about information known or reasonably available to the Company and their testimony shall be binding on the Company. If the Company believes that the required date of testimony would be unduly burdensome, you are encouraged to discuss with the Commission counsel identified in this Subpoena whether there is a mutually agreeable alternative date.

## MATTERS FOR EXAMINATION

1.   The Company's efforts to timely comply with the CID, including but not limited to:

    a.   Resources allocated and efforts undertaken to collect, review, and produce responsive documents and data, including but not limited to when and from whom documents and data were collected;

    b.   Resources allocated and efforts undertaken to prepare and produce narrative responses; and

    c.   The identities and relevant responsibilities of all people involved in the Company's efforts to comply.

2.   The Company's policies and procedures relating to the retention and destruction of documents and data, and the steps the Company took to preserve documents related to the CID.

## DEFINITIONS

For the purposes of this Subpoena to Testify at an Investigational Hearing, the following Definitions apply:

D 1.   The term "the Company" or "Company" means CVS Health Corporation, its domestic and foreign parents, predecessors, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, principals, employees, agents, and representatives of the foregoing.

D 2.   The term "CID" means the Civil Investigative Demand issued by the Federal Trade Commission to the Company on December 8, 2023, in FTC File No. 2410005.

D 3.  All Definitions in the Civil Investigative Demand issued to the Company on December 8, 2023 apply to this Subpoena to Testify at an Investigational Hearing.

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:    Lina M. Khan, Chair
Noah Joshua Phillips
Rohit Chopra
Rebecca Kelly Slaughter
Christine S. Wilson

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS**
**REGARDING ACTS OR PRACTICES**
**AFFECTING HEALTHCARE MARKETS**

**File No. P210100**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices in, or affecting commerce related to healthcare markets, including those regarding pharmaceuticals, pharmacies, pharmacy benefit managers, medical devices, hospitals, or other healthcare facilities or services, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it, including subpoenas and orders to file special reports, be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period..

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued:  July 1, 2021**
**Expires:  July 1, 2031**

# Exhibit 4

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:        **Lina M. Khan, Chair**
                      **Rebecca Kelly Slaughter**
                      **Alvaro M. Bedoya**
                      **Melissa Holyoak**
                      **Andrew Ferguson**

| | |
|---|---|
| | ) |
| **In the Matter of** | ) |
| | ) |
| **SUBPOENA AD TESTIFICANDUM TO** | ) |
| **CVS HEALTH CORPORATION,** | ) |
| **DATED OCTOBER 16, 2024** | ) |
| | ) |

**ORDER DENYING PETITION TO QUASH**
**SUBPOENA AD TESTIFICANDUM**

**By BEDOYA, Commissioner:**

CVS Health Corporation ("CVS") has petitioned to quash an FTC Subpoena Ad Testificandum ("SAT") issued October 16, 2024, that directs CVS to make available a representative to testify about CVS's efforts to comply with a Civil Investigative Demand ("CID") issued on December 8, 2023. For the reasons stated below, the petition to quash ("Petition") is denied.

**I.      BACKGROUND**

On December 8, 2023, the Commission issued a CID to CVS seeking documents, data, and narrative responses relevant to an investigation into potential anticompetitive or unfair practices by CVS and the other two largest pharmacy benefit managers ("PBMs"). Some of the information requested by the CID overlaps with information previously requested from CVS Caremark under Section 6(b) of the FTC Act, 15 U.S.C. § 46(b), as part of a Commission study of PBM practices; however, the CID and 6(b) Order differ in both scope and relevant time period. For example, the CID requests information regarding CVS's efforts to require or incentivize beneficiaries to use CVS's affiliated pharmacies, but the 6(b) Order did not. And whereas the 6(b) Order only sought materials created on or before June 6, 2022, the CID, absent modification, requires CVS to produce materials created up to 30 days prior to certification of compliance. Due to these differences, compliance with the CID requires a different collection methodology, including different custodians and search terms, than the 6(b) Order.

-1-

CVS has been out of compliance with the CID for more than eight months, since March 12, 2024, when the last extension of the CID return date expired.[1] To date, nearly all of the documents CVS has produced in response to the CID are documents also produced in response to the 6(b) Order. Indeed, fewer than 1,000 of the 1.2 million documents (~0.08%) CVS produced since the CID issued are responsive uniquely to the CID. Additionally, the documents CVS has produced in response to the 6(b) Order are at least 2½ years old. Though Commission staff has made various concessions to reduce CVS's claimed burden, CVS has failed to agree on an adequate production plan for materials not covered by the 6(b) Order. In its Petition, CVS states that it told staff that CVS "expect[s]" its compliance with the CID to be completed by February 28, 2025. Pet. at 5. But CVS has not committed to this date, and in its last conversation with staff, CVS noted that even this "expected" date could slip.

To better inform staff's ongoing efforts to obtain compliance with the CID, on October 16, 2024, the Commission issued a subpoena to CVS for testimony regarding: (1) CVS's "efforts to timely comply with the CID" and (2) CVS's "policies and procedures relating to the retention and destruction of documents and data, and the steps the Company took to preserve documents related to the CID." Pet. Ex. 1. CVS seeks to quash the SAT, arguing that the Commission's request for oral testimony on these topics seeks information not reasonably relevant to the FTC's investigation, is unduly burdensome, issued for an improper purpose, and impermissibly seeks privileged information. Importantly, CVS has not sought to limit or quash the underlying December 8, 2023 CID.

## II.    ANALYSIS

Under Rule 2.7(h) of the Commission's Rules of Practice, 16 C.F.R. § 2.7(h), the Commission may obtain by compulsory process the testimony of a corporate entity by describing with "reasonable particularity the matters for examination." The corporate entity then "must designate one or more officers, directors, or managing agents, or designate other persons who consent, to testify on its behalf." *Id.* Consistent with Rule 2.7(h)'s requirements, the SAT clearly specifies two discrete topics for testimony from a CVS designated witness. CVS presents no justifiable reason to quash this narrowly tailored subpoena.

Compulsory process is proper if the inquiry "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant" to the investigation. *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). The SAT easily meets this standard. As discussed below: (1) the SAT seeks information vital to Commission staff's investigation; (2) the SAT is narrowly tailored and not unduly burdensome; (3) the SAT was not issued to harass CVS; and (4) the SAT does not seek testimony protected by attorney-client or the work product doctrine.

---

[1] *See* FTC email to CVS, March 12, 2024 (referring to February 8, 2024 CID return date modification letter). The extension of the CID return date to March 12, 2024, was the last CVS sought.

A.      **The SAT seeks information directly relevant to the Commission's investigation**

To quash Commission compulsory process on the basis of relevance, a petitioner must show that "the information sought is [not] 'reasonably relevant' to the agency's inquiry." *FTC v. Anderson*, 631 F.2d 741, 745 (D.C. Cir. 1979) (quoting *Morton Salt Co.*, 338 U.S. at 652). This is a high bar: "The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992); *see also Matter of Civ. Investigative Demand to Intuit Inc.* (*Intuit*), No. 192-3119, 2020 WL 5037437, at *3 (FTC Aug. 17, 2020) ("The standard for the relevance of administrative compulsory process is … broader and more relaxed than would be in an adjudicatory discovery demand.") (citations and internal quotation marks omitted). The evaluation of reasonableness "need not be limited to information necessary to prove a specific charge; [the Commission] can demand, instead, any documents or information 'relevant to the investigation—the boundary of which may be defined quite generally' by the Commission." *Intuit*, 2020 WL 5037437, at *3 (citing *Invention Submission Corp.*, 965 F.2d at 1090). The D.C. Circuit, addressing FTC subpoenas, has explained that "the test is satisfied if the documents sought are 'not plainly irrelevant' to the investigative purpose." *FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980) (citation omitted). "The [Commission's] own appraisal of relevancy must be accepted so long as it is not obviously wrong." *FTC v. Bisaro*, 757 F. Supp. 2d 1, at 6 (D.D.C. 2010) (citing *Invention Submission Corp.*, 965 F.2d at 1089; *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977)) (granting FTC's Petition for an Order Enforcing Administrative Subpoena *Ad Testificandum*).

Applying these standards here, we conclude that CVS's relevance challenge is meritless. CVS's efforts to comply with the CID—the first topic of the SAT—are directly relevant to the investigation, particularly given that CVS has been out of compliance with the CID since March 12, 2024, and has produced very little beyond what it previously produced in response to the 6(b) Order (a mere 1,000 documents). As the Commission has recognized when denying a petition to quash objecting to similar testimony, "[t]o advance the Commission's mission, FTC staff must be allowed latitude in taking steps to explore relevant topics by issuing supplemental process and taking testimony, particularly where, as here, a company has been lax in responding to the Commission's informational needs." *In re Civil Investigative Demand to Fully Accountable, LLC Dated September 10, 2018*, FTC No. 1723195, at 4 (Nov. 19, 2018). Indeed, a company's efforts to respond to process are relevant in any investigation. And that information is precisely what the SAT seeks.

We reject CVS's arguments that the SAT is "excessive" and therefore not reasonably relevant. Pet. at 7–8. CVS argues that because it has produced "a substantial amount of information" responsive to the CID, testimony about its compliance efforts is not reasonably relevant to the investigation. *Id.* at 7. But this argument ignores that nearly all of CVS's response to the CID has been confined to production of materials provided in connection with the 6(b) Order. Eight months have elapsed since the CID's extended return date expired, yet CVS still has not made any meaningful production of *additional information* that the CID alone (not the 6(b)

Order) requires. In fact, the concerns motivating the SAT are grounded in what CVS has done—or not done—to comply with the CID *beyond* its response to the 6(b) Order.

CVS points to the number of hours it has spent on document productions "related to this matter." Only a small portion of these hours, i.e., 13%, were incurred after issuance of the CID. Pet. at 8 (specifying 180,000 hours total, including 24,000 hours after December 8, 2023), and CVS never claims that even this 13% relates exclusively to the CID. By focusing its arguments on CVS's efforts to comply with the earlier 6(b) Order rather than what it has done specifically to comply with the CID, CVS underscores the need for the SAT in the first place. Moreover, though CVS presents this as a relevance challenge, its focus on the effort it has expended is really an argument about the burden of complying with the CID—a CID that CVS never moved to limit or quash—not a showing that the topics of the SAT lack relevance.

As to the second topic of the SAT regarding document retention policies, CVS argues that because it produced its document retention policies, it is unreasonable for Staff to seek testimony about CVS's "policies and procedures relating to the retention and destruction of documents and data, and the steps [CVS] took to preserve documents related to the CID." Pet. at 8; Pet. Ex. 1. Implicit in this argument is the idea that documents are a proxy for testimony, but testimony "'typically provide[s] an opportunity to further probe the facts elicited through [other investigatory tools].'" *Intuit*, 2020 WL 5037437 at *6-7 (quoting *English v. WMATA*, 323 F.R.D. 1, 26 (D.D.C. 2017)). Indeed, CID recipients, "having provided [responsive documents and information], should reasonably expect to be queried about [those documents and information]." *Id* at 7. Critically, the text of CVS's policies provides no insight into whether CVS has in fact adhered to them.

**B.    The SAT focuses narrowly on CVS's efforts to produce non-6(b) materials responsive to the CID and is not unduly burdensome**

Quashing compulsory process on the basis of undue burden requires a petitioner to demonstrate that the request "threatens to unduly disrupt or seriously hinder [the petitioner's] normal [business] operations." *Texaco*, 555 F.2d at 882. "The burden of showing that the request is unreasonable is on the subpoenaed party." *Id.*[2] As with the relevance standard, this is a high bar: "Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Texaco*, 555 F.2d at 882.[3] Establishing undue burden is all the more difficult "where, as here, the agency inquiry is pursuant to a lawful purpose and the requested [information is] relevant to that purpose." *Texaco*, 555 F.2d at 882. At

___

[2] *See also FTC v. Carter*, 464 F. Supp. 633, 641 (D.D.C. 1979), aff'd, 636 F.2d 781 (D.C. Cir. 1980) (citation omitted) ("[T]he Court will assume reasonableness absent a showing that compliance threatens to disrupt or unduly hinder the normal operations of a business."); *Bisaro*, 757 F. Supp. 2d at *6 ("It is well established that a district court must enforce a federal agency's investigative subpoena if the information sought is reasonably relevant—or, put differently, not plainly incompetent or irrelevant to any lawful purpose of the [agency]—and not unduly burdensome to produce.") (citation omitted) (granting FTC's Petition to Enforce SAT).

[3] *See also FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980) ("[A]ny subpoena places a burden on the person to whom it is directed. Time must be taken from normal activities and resources must be committed to gathering the information necessary to comply. Nevertheless, the presumption is that compliance should be enforced to further the agency's legitimate inquiry into matters of public interest.").

a minimum, the petitioner must "ma[ke] a record that would convince [the Commission] of the measure of their grievance rather than ask [the Commission] to assume it." *Morton Salt*, 338 U.S. at 654.

CVS's Petition makes no such showing. Despite describing the SAT as "excessive," the Petition fails to identify *any* specific burden regarding SAT compliance other than "the burden of having to prepare a CVS representative to answer questions during an investigational hearing." Pet. at 7, 9. As discussed above, the SAT is narrowly tailored to elicit testimony on two discrete topics and does not require the production of any documents, data, or other information. CVS's general claim of undue burden from "preparing a CVS representative to answer questions" about CID compliance, Pet. at 9, does not come close to the required showing of demonstrating that "compliance threatens to disrupt or unduly hinder [CVS's] normal [business] operations." *Carter*, 464 F. Supp. at 641 (citation omitted). While identifying and preparing the appropriate witnesses to testify on behalf of a corporation might require substantial effort, that does not excuse a corporation from the obligation to provide relevant testimony. Courts have acknowledged that "[p]reparing a . . . designee [to provide a corporation's testimony] may be an onerous and burdensome task, but this consequence is merely an obligation that flows from the privilege of using the corporate form to do business." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 689 (S.D. Fla. 2012).

Unable to describe the specific burden of SAT compliance, CVS again focuses on the productions it has made to date and, in doing so, stretches the facts. CVS claims that "[f]or the December CID in particular, CVS has produced more than 1.2 million documents across more than 6 million pages requiring more than 180,000 hours of work by CVS's e-discovery vendor alone." Pet. at 1-2. These efforts, however, relate almost entirely to compliance with the 6(b) Order. Indeed, fewer than 1,000 of the "1.2 million documents" CVS produced since the CID issued are responsive uniquely to the CID.

Nor do the cases cited by CVS (Pet. at 8) support its arguments. *FTC v. Texaco* recognizes that "[s]ome burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest," 555 F.2d at 882, and CVS does not claim complying with the SAT itself would be unduly burdensome. *Dow Chemical Co. v. Allen* involved an adjudicative subpoena, not an agency's investigative subpoena—and, in any event, the Seventh Circuit recognized that "[t]he assessment of what is unreasonable or unnecessary, by definition, depends to a large extent on the reasons or needs underlying the request." 672 F.2d 1262, 1269-70 (7th Cir. 1982); *id.* at 1268 ("[T]he relevancy of an investigatory subpoena is measured against the 'general purposes of (the agency's) investigation,' ... while relevancy of an adjudicative subpoena is measured against the charges specified in the complaint.") (quoting *Anderson*, 631 F.2d at 746). The Commission recently emphasized the distinction between adjudicative and investigative subpoenas when rejecting a similar argument, noting, "the [*Dow Chem.*] court specifically acknowledged that investigative subpoenas may be broader in scope" than trial subpoenas. *In the Matter of Subpoena Duces Tecum Issued to Humana, Inc. Dated Apr. 10, 2017*, No. 161-0026, 2017 WL 2570859, at *5 (FTC June 5, 2017) (stating that *Dow Chemical Co. v. Allen* "involved an administrative *trial* subpoena, not an *investigative* subpoena") (emphasis in original). Finally, *In re Civil*

-5-

*Investigative Demand 15-439* is inapposite. At issue in that case was the burden of producing duplicative materials the CID target had already produced. *In re Civil Investigative Demand 15-439*, No. 5:16-MC-3, 2016 WL 4275853, at *1 (W.D. Va. Aug. 12, 2016) (noting that "the government acknowledges that certain of the information requested in the CID is already in its possession by virtue of its six year investigation" and directing the parties "to meet and confer on categories of relevant, non-duplicative documents to be produced"). Here, the SAT seeks testimony about compliance with the CID including about materials not already produced in response to the 6(b) Order. This information is not already in the Commission's possession.

### C.    The SAT was issued for a proper purpose

CVS also argues that the SAT was issued for an improper purpose and therefore must be quashed consistent with *United States v. Powell*, 379 U.S. 48, 58 (1964). CVS asserts that Chair Khan, Commissioner Slaughter, and Commissioner Bedoya "have prejudged the outcome of the underlying investigation" and points to allegedly prejudicial public statements they have made about Caremark and other PBMs. Pet. at 10-11. CVS contends that "[t]he most likely conclusion one could draw from the facts and circumstances in this matter is that the FTC's Subpoena is designed to harass CVS." *Id.* at 10. We disagree.

In *Powell*, the Supreme Court recognized (addressing an IRS summons) that courts may deny enforcement of an administrative compulsory process that "ha[s] been issued for an improper purpose, such as to harass the [recipient] or to put pressure on [the recipient] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. In *United States v. LaSalle National Bank*, the Supreme Court addressed *Powell,* again in the context of an IRS administrative summons. 437 U.S. 298, 301 (1978). The Court held that "those opposing enforcement of a summons do bear the burden to disprove the actual existence of a valid . . . purpose by the [IRS]." *LaSalle Nat'l Bank*, 437 U.S. at 316. Circuit courts have explained that this burden is a high one. For example, the Third Circuit held that "the burden on the party to whom the subpoena is addressed is not a meager one. It must come forward with facts suggesting that the subpoena is intended *solely* to serve purposes outside the purview of the jurisdiction of the issuing agency." *NLRB v. Interstate Dress Carriers, Inc.*, 610 F.2d 99, 112 (3d Cir. 1979) (emphasis added, internal citation omitted). And the D.C. Circuit, addressing FTC subpoenas, has specified that "even if an improper purpose by an agency or member of the staff is shown, enforcement of the subpoena is called for so long as proper purposes exist as well." *FTC v. Carter*, 636 F.2d at 789 (affirming district court's denial of respondent's attempt to seek discovery about an alleged improper purpose in a Commission action to enforce its subpoenas); *accord Bisaro*, 757 F. Supp. 2d at 11 (finding that subpoena recipient failed to demonstrate abuse of process by the Commission with respect to the subpoena).

CVS fails to meet its heavy burden to show that the SAT was issued solely to serve purposes outside the purview of the jurisdiction of the issuing agency. It bears repeating that CVS never disputed that the CID was validly issued for an investigational purpose well within the Commission's authority. In light of Commission staff's difficulties obtaining compliance with the CID and, as already discussed, the clear relevance of testimony concerning CVS's

compliance efforts, it cannot reasonably be denied that the SAT serves a proper purpose. That is enough to overcome CVS's argument that the SAT should be quashed due to improper purpose.

### D.    The SAT seeks testimony not protected by attorney-client privilege or the work product doctrine

Finally, CVS argues that the Commission should grant the Petition because the SAT "[i]mpermissibly [s]eeks [p]rivileged [i]nformation." Pet. at 11-12. In support, CVS cites *Smithkline Beecham Corp. v. Apotex Corp.* for the proposition that deposition topics implicating protections from disclosure warrant quashing the SAT in its entirety. Pet. at 12. Contrary to CVS's reading of *Smithkline Beecham Corp.*, however, the court there did not strike the challenged topic on the basis that it could potentially implicate work product and attorney-client privilege. Rather, it found the topic notice "[i]n its present form, . . . overbroad, unduly burdensome, and an inefficient means through which to obtain otherwise discoverable information." *Smithkline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952, 2000 WL 116082, at *10 (N.D. Ill. Jan. 24, 2000). Indeed, the Commission has previously considered and dismissed the precise argument CVS makes here. *Intuit*, 2020 WL 5037437 at *7. We noted that "to the extent that [*Smithkline*] is read . . . as holding that potential privilege concerns in corporate testimony about discovery responses justif[y] categorically striking down the entire inquiry—rather than dealing with privilege claims during the testimony on a question-by-question basis—we disagree with it as contrary to the weight of authority." *Id.* We further explained that, "to the extent that, during its corporate testimony, [respondent's] designee is asked a question that in fact elicits privileged information, [respondent's] counsel 'may protect against the disclosure . . . by interposing appropriate objections and giving instructions on a question-by-question basis.'" *Id.* (quoting *SEC v. Merkin*, 283 F.R.D. 689, 698 (S.D. Fla. 2012)). We concluded that "the mere existence of such a possibility is no reason to preclude all questioning." *Id.* (citing *United States v. Matsura*, No. 14-CR-388, 2015 WL 10912346, at *5 (S.D. Cal. July 10, 2015) (withholding privileged information, not quashing entire subpoena request, is proper recourse to address privilege concerns). CVS offers no reason why the Commission should reach a different result here.

## III. CONCLUSION

For the foregoing reasons, CVS's petition to quash is denied.

**IT IS HEREBY ORDERED THAT** CVS's Petition to Quash or Limit the October 16, 2024 Subpoena Ad Testificandum be, and hereby is, **DENIED**.

**IT IS FURTHER ORDERED THAT** CVS shall comply in full with the Commission's Subpoena Ad Testificandum and shall appear to testify on the specified topics at the designated location on December 20, 2024, or at such other date, time, and location as the Commission staff may determine.

By the Commission.

April J. Tabor
Secretary

ISSUED:  December 3, 2024

# Exhibit 5

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:     **Lina M. Khan, Chair
Noah Joshua Phillips
Rohit Chopra
Rebecca Kelly Slaughter
Christine S. Wilson**

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS
REGARDING ACTS OR PRACTICES
AFFECTING HEALTHCARE MARKETS**

**File No. P210100**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices in, or affecting commerce related to healthcare markets, including those regarding pharmaceuticals, pharmacies, pharmacy benefit managers, medical devices, hospitals, or other healthcare facilities or services, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it, including subpoenas and orders to file special reports, be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period..

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued:  July 1, 2021
Expires:  July 1, 2031**